**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| Bryan Montiea Wilson, | C/A No. _____ |
| Plaintiff, | |
| v. | |
| Ofc. Calvin Brown and Ofc. David Thompson, | **COMPLAINT** **(Jury Trial Demanded)** |
| Defendants | |

Plaintiff Bryan Montiea Wilson was falsely indicted by the U.S. Government based on the so-called evidence gathered by Defendants Calvin Brown and David Thompson, police officers for the City of West Columbia, South Carolina acting as task force officers (TFOs) for the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Ofcs. Brown and Thompson, with the assistance of persons both known and unknown, are believed to have presented their false evidence to a federal grand jury that mistakenly trusted them and returned an eight-count indictment accusing Mr. Wilson, an entirely innocent man, of drug trafficking and gun crimes punishable by 115 years in the federal penitentiary and fines of up to $17 million. As a result of the falsely obtained indictment, a federal judge issued a bench warrant and Mr. Wilson was arrested—humiliated and taken out of his workplace in handcuffs for a crime he not only did not commit but had no association with whatsoever.

The U.S. Government concedes it indicted an innocent man. After Mr. Wilson was arraigned, the Government moved to dismiss the charges, obliquely claiming: "Further review of the case reveals that the interests of justice would best be served by a dismissal of the pending charges as opposed to further prosecution." United States v. Wilson, 3:23-cr-00976-JFA, Dkt.

No. 11 at 1 (D.S.C. filed Dec. 13, 2023). The Court dismissed the charges against Mr. Wilson *with* prejudice, meaning they are forever barred.

This civil rights action seeks money damages to compensate Mr. Wilson for the indignity of his unlawful indictment, search, seizure, and detention and accountability for the law enforcement officers responsible for gathering and presenting admittedly false information to a federal grand jury, a U.S. District Court, and the public.

Mr. Wilson would respectfully show the Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Bryan Montiea Wilson is a resident of Richland County, South Carolina and a law-abiding citizen who works an honest job for a living.

2.    Defendant Calvin Brown is believed to be a citizen of South Carolina and, at all relevant times, a duly sworn police officer for the City of West Columbia acting under the color of state law.

3.    Defendant David Thompson is believed to be a citizen of South Carolina and, at all relevant times, a duly sworn police officer for the City of West Columbia acting under the color of state law.

4.    City of West Columbia is a municipal corporation organized under the laws of the State of South Carolina that includes various departments and divisions, including the West Columbia Police Department (West Columbia PD). At all times relevant to this action West Columbia PD employed Ofcs. Brown and Thompson. City of West Columbia and West Columbia PD are not defendants in this action.

5.    U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) is a law enforcement agency in the U.S. Department of Justice (DOJ), a department of the United States

of America. At all times relevant to this action, ATF was lead federal law enforcement agency responsible for the investigation that resulted in Mr. Wilson's wrongful indictment and false arrest. ATF is believed to liaison with local law enforcement agencies like West Columbia PD and their officers, Ofcs. Brown and Thompson, who are dubbed "task force officers" (TFOs). At all times relevant to this action, Ofcs. Brown and Thompson are believed to have been acting as TFOs. ATF is not a defendant in this action.

6.      The Court has subject matter jurisdiction over claims brought under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331.

7.      The Court has personal jurisdiction over all Defendants because acts and omissions described below occurred within the District of South Carolina.

8.      Venue is proper in the district, and specifically in the Columbia Division, because most or all the conduct described below occurred within Richland and Lexington Counties.

**FACTS**

9.      From November 2022 to March 2023, Ofcs. Brown and Thompson, working in conjunction with ATF, conducted a series of gun and drug purchases from (among others) someone they identified as Mr. Wilson, the Plaintiff.

10.     According to their own incident reports, the person Ofcs. Brown and Thompson were surveilling during these so-called controlled drug and gun buys was "WILSON, BRYAN MONTIEA" or "BRYAN WILSON."

11.     Stranger still, their reports list the alleged perpetrator's address *as Mr. Wilson's address*, and describes the perpetrator as a black male, 33 years old, five foot ten inches tall, with black hair and brown eyes. This description generally matches Mr. Wilson.

12.    However, during each and every instance reported by the Defendants, Mr. Wilson (the Plaintiff) was not, in fact, the person observed committing federal gun and drug crimes.

13.    For example, on November 10, 2022, Ofc. Thompson claims West Columbia PD detectives met ATF agents in West Columbia where they purchased guns and drugs, in relevant part: "A CONTROLLED PURCHASE FOR ONE FIREARM WAS NEGOTIATED FOR THE PRICE OF $1000 FROM THE SUSPECT IDENTIFIED AS BRYAN WILSON THROUGH THE USE OF CONFIDENTIAL INFORMANTS AND UNDERCOVER OFFICERS." Ofc. Thompson's report claims this purchase was "UNDER CONSTANT ELECTRONIC SURVEILLANCE BY INVESTIGATORS."

14.    Also on November 10, 2022, Ofc. Brown claims West Columbia PD detectives met ATF agents in West Columbia where they purchased drugs, in relevant part: "THE SECOND CONTROLLED PURCHASE WAS FOR 17 GRAMS OF CRACK FROM THE SUSPECT WHO WAS IDENTIFIED AS BRYAN WILSON." Ofc. Brown's report also claims the purchase was electronically surveilled.

15.    Mr. Wilson (the Plaintiff), however, was not the person observed by Defendants and ATF.

16.    Nevertheless, later that evening, at 6:30 p.m., an ATF agent texted Ofcs. Brown, Thompson, and others a congratulatory message: "Today was a great day and it would not have happened with out [sic] the team work [sic]".

17.    On November 18, 2022, Ofc. Brown claims he met ATF agents in West Columbia where they purchased drugs from, among others, Mr. Wilson: "THE THIRD CONTROLLED PURCHASE WAS FOR 28.06 GRAMS OF METHAMPHETAMINE AND 25.60 GRAMS OF

CRACK COCAINE FROM THE SUSPECT IDENTIFIED AS BRYAN WILSON." Again, Ofc. Brown claims this incident is recorded by electronic surveillance.

18.     At 6:55 p.m. that day, an ATF agent texted the Defendants and their collegues: "[REDACTED]- 1 ounce cocaine 4 ounces ice [REDACTED] 2 guns [REDACTED] 2 ounces cocaine [REDACTED] aka [REDACTED] 2 ounces ICE Brian [sic] Wilson- 1 ounce crack , 1 ounce ICE [REDACTED] – 1 ounce Fentanyl 3 Guns" followed by, "Good day thank you".

19.     Mr. Wilson was not, in fact, the individual identified by the Defendants.

20.     On January 17, 2023, Ofc. Brown claims West Columbia PD detectives and ATF agents met in West Columbia and, in relevant part: "THE FIRST CONTROLLED PURCHASE WAS FOR $2200 WORTH OF CRACK COCAINE (2.9 OUNCE) AND $300 WORTH OF METHAMPHETAMINE FROM THE SUSPECT IDENTIFIED AS BRYAN WILSON." Ofc. Brown claims this is recorded by surveillance.

21.     Again, the Defendants did not, in fact, observe Mr. Wilson selling drugs.

22.     On March 15, 2023, Ofc. Thompson claims West Columbia PD detectives and ATF agents met at a "CONFIDENTIAL LOCATION" in West Columbia and, in relevant part: "A CONTROLLED PURCHASE FOR 2 FIREARMS FOR THE PRICE OF $1,900 AND 29 GRAMS OF METHAMPHETAMINE FOR THE PRICE OF $280 FROM THE SUSPECT IDENTIFIED AS BRYAN WILSON WAS CONDUCTED THROUGH THE USE OF CONFIDENTILA INFORMANTS AND UNDERCOVER OFFICERS." Ofc. Thompson also claims this was recorded by surveillance.

23.     Upon information and belief, there are other instances in which the Defendants, ATF, or other TFOs falsely identified Mr. Wilson as the perpetrator of gun and drug crimes.

24.     On December 5, 2023, a six-page indictment was filed with the U.S. District Court after being signed as a "True Bill" by the foreperson of the federal grand jury and by a prosecutor in the U.S. Attorney's Office.

25.     The eight-count indictment in case <u>United States v. Wilson</u>, 3:23-cr-00976-JFA (D.S.C.), alleges that "**BRYAN MONTIEA WILSON**" (bold and caps original) committed the following federal crimes:

    a.  **Count One:** Possessing and distributing crack cocaine on November 10, 2022, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

    b.  **Count Two:** Possessing and distributing five grams or more of methamphetamine (i.e., "meth") and crack cocaine on November 18, 2022, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and (b)(1)(C).

    c.  **Count Three:** Possessing and distributing crack cocaine on December 8, 2022, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

    d.  **Count Four:** Using and carrying a firearm during a drug trafficking crime on December 8, 2022, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

    e.  **Count Five:** Possessing and distributing five grams or more of meth and crack cocaine on January 17, 2023, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and (b)(1)(C).

    f.  **Count Six:** Using and carrying a firearm during a drug trafficking crime on January 17, 2023, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

    g.  **Count Seven:** Possessing and distributing five grams or more of meth on March 13, 2023, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

    h. **Count Eight:** Using and carrying a firearm during a drug trafficking crime on March 13, 2023, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

26. These crimes carry a possible penalty of 115 years in the federal penitentiary and fines of up to $17 million.

27. The federal indictment also sought to forfeit (i.e., take) property the Government claimed was (a) proceeds of the alleged drug trafficking, (b) used to commit or facilitate the drug trafficking, or (c) totally unrelated property seized as a substitute for proceeds or property used to commit or facilitate the alleged crimes.

28. That same day, a U.S. Magistrate Judge issued a bench warrant at the request of a prosecutor in the U.S. Attorney's Office.

29. On Wednesday, December 13, 2023, at approximately 6:00 a.m., Mr. Wilson arrived at work—Harsco Rail's 1005 Technology Drive, West Columbia, South Carolina location—where he is a material processor for the railroad equipment supplier.

30. Mr. Wilson began working his shift.

31. Unbeknownst to him, while he was working, ATF and TFOs—possibly the Defendants—arrived at Harsco Rail and began searching Mr. Wilson's car in the parking lot.

32. Mr. Wilson later learned that some of his co-workers witnessed his vehicle being searched as they watched from the building.

33. At approximately 8:30 a.m., Unknown Agent 1, 2, and 3—two men and one woman, all white and wearing plainclothes—walked into the general manager's office.

34. Shortly thereafter, Mr. Wilson's supervisor found him on the facility floor and told him to come to the office.

35.    Mr. Wilson's supervisor walked him to the office where Unknown Agent 1 told him Unknown Agent 1, 2, and 3 were federal agents with a warrant for his arrest.

36.    Mr. Wilson was not shown a badge.

37.    When the agents told him what the charges were, Mr. Wilson told the agents they had the wrong person.

38.    Mr. Wilson was handcuffed with his hands behind his back without incident.

39.    Mr. Wilson was patted down and searched. They removed his hat.

40.    Mr. Wilson told the agents he was diabetic. His supervisor retrieved Mr. Wilson's bag from his locker with some juice, a Pop Tart, medication, and a blood sugar monitor.

41.    Mr. Wilson was walked out of the facility by the agents in handcuffs with his jacket on his shoulders and all his belongings.

42.    His arrest was observed by his co-workers.

43.    As he was led out of his workplace in handcuffs, Mr. Wilson saw Unknown Agent 4 and 5, who were outside the facility and are believed to be the persons responsible for searching his vehicle.

44.    Mr. Wilson was taken to the U.S. District Courthouse, 901 Richland Street, Columbia, South Carolina.

45.    In the car on the way to the courthouse, Mr. Wilson called his brother, who then notified his parents.

46.    When he arrived at the courthouse, Mr. Wilson was searched again and "booked." Mr. Wilson cooperated with the woman responsible for his booking by answering her questions.

47.    His fingerprints and mugshot were taken.

48.    His belongings—phone, wallet, jacket, hat, bag, etc.—were searched and taken.

49.     Then he was locked in a cell for several hours.

50.     Eventually Mr. Wilson met with his lawyer, a federal public defender.

51.     This was the first time he received a copy of the indictment that listed the charges against him—five counts of possession with intent to distribute a controlled substance and three counts of possession of a firearm in furtherance of a drug trafficking offense—and the bench warrant for his arrest.

52.     As his attorney attempted to discuss the charges with Mr. Wilson, he repeatedly told her there was some sort of mistake.

53.     Then Mr. Wilson was taken to a courtroom to be arraigned before a U.S. Magistrate Judge by having the charges against him read from the unsealed indictment.

54.     Unknown Agent 1 falsely told the judge that ATF had been watching Mr. Wilson for 13 months and then listed dates the ATF false claimed he sold drugs.

55.     The agent also falsely told the judge that the Government had Mr. Wilson on tape committing these crimes.

56.     The agent also told the judge that all other persons involved in the crimes had also been indicted.

57.     Mr. Wilson pleaded not guilty.

58.     Mr. Wilson was given a bond by the judge, but the Government invoked its right to have Mr. Wilson "held over" in federal custody for several days before he would be permitted to post his bond and be released, meaning he would be transferred to the Barnwell County jail to be held until the following Monday.

59.     When the hearing concluded, Mr. Wilson continued to explain to his lawyer that there was a mistake.

60.     Fortunately, his attorney took him seriously.

61.     Mr. Wilson had been arrested at work and was still wearing his work uniform.

62.     He had no prior criminal record.

63.     His family was present in the courtroom, also insisting there was a mistake.

64.     His attorney persuaded the Government to hold him at the federal courthouse long enough to investigate the matter further.

65.     Mr. Wilson was held in a secure room in the courthouse where the U.S. Marshals checked on him to ensure he had adequate food and drink to keep his diabetes under control.

66.     Eventually, Mr. Wilson was informed by his lawyer that a motion to dismiss the case against him had been filed and that they were waiting for a U.S. District Judge to sign off.

67.     In fact, the Government finally realized it had the wrong man and moved to dismiss its own case.

68.     Nevertheless, the Government's motion is three short paragraphs and offers no explanation for its decision to dismiss its own case. It reads in full:

> The United States of America, by and through its undersigned counsel, respectfully moves this Court to dismiss the charges pending against the above-named defendant with prejudice, and in support of this motion, avers as follows:
>
> On December 5, 2023, the grand jury for the District of South Carolina returned an Indictment against the defendant in the above-titled case, charging the defendant with five counts of possession with intent to distribute a controlled substance in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and 841(b)(1)(C) and three counts of possession of a firearm in furtherance of a drug trafficking offense in violation of Title 18, United States Code, Section 924(c). The defendant was arraigned on these charges on December 13, 2023.
>
> Further review of the case reveals that the interests of justice would best be served by a dismissal of the pending charges as opposed to further prosecution. Based on the foregoing, the

Government respectfully requests that the Court dismiss the pending charges against defendant Bryan Montiea Wilson.

Wilson, supra, Dkt. No. 11.

69.     Sometime after the Government filed the motion to dismiss, a U.S. District Judge entered an Order dismissing the case, stating:

The United State of America has moved to dismiss with prejudice the pending charges against defendant Bryan Montiea Wilson claiming that the interests of justice would be best served by dismissal as opposed to further prosecution. The Motion to Dismiss is granted, and it is hereby ordered and decreed that the pending charges against Bryan Montiea Wilson in the above-captioned case are hereby dismissed with prejudice.

Wilson, supra, Dkt. No. 19.

70.     At approximately 4:20 p.m., Mr. Wilson was released from federal custody, his belongings were returned to him, and he was permitted to leave the courthouse.

71.     At all times relevant to this action, Mr. Wilson was cooperative and peaceful with the agents detaining him.

72.     Mr. Wilson took the next four days off.

73.     During that time, he barely left his house.

74.     He also began suffering from migraines.

75.     When Mr. Wilson returned to work, he did not return to the off-site where he was arrested.

76.     Mr. Wilson later learned that on the day he was arrested, his supervisor called a meeting of all staff and admonished co-workers against spreading rumors about Mr. Wilson.

77.     Nevertheless, many rumors about Mr. Wilson have been spread amongst his co-workers, particular at the off-site.

78.     People called Mr. Wilson's brother to ask about his arrest.

79.     Others sent Mr. Wilson messages on Facebook.

80.     Some of the rumors falsely claimed Mr. Wilson was released because he had "rolled" on a co-defendant.

81.     The worst of these rumors falsely speculated that he committed a killing or a rape.

82.     Mr. Wilson continues to periodically suffer from migraines.

83.     He has stopped going to the gym or doing fight training—his fitness passion.

84.     He worries about his teenage daughter learning what happened to him.

85.     He also worries for his parents, specifically his mother who continues to feel paranoia and anxiety stemming from the incident and now calls her son while he is at work to check on his wellbeing.

86.     Mr. Wilson is a father, brother, and son, and a law-abiding citizen who works for an honest living.

87.     He has never trafficked drugs.

88.     He is a lawful gun owner.

89.     He has no criminal record.

90.     Apparently, Mr. Wilson's was one of approximately 20 individuals targeted, indicted, and arrested as part of what the Government touted as a "major" drug-and-guns crackdown during a press conference held on Thursday, December 14, 2023.

91.     According to a report by THE STATE newspaper,[1] the ATF bragged that its operation was "an advanced, intelligence-based, multi-faceted law enforcement operation" using undercover agents and informants to buy illegal drugs and guns.

_____

[1] John Monk, "SC feds arrest man at work, take him to court. Now they admit he was the wrong guy," THE STATE (Dec. 15, 2023), available at:
https://www.thestate.com/news/local/crime/article283072893.html#storylink=cpy.

92.     Indicting an innocent man entirely unconnected to the alleged offenses is neither "advanced" nor "intelligent"—it is incompetent, unlawful, and malignant to the innocent person maligned by the Government's so-called investigation and prosecution.

93.     The Defendants and their ATF confederates know their conduct here was wrong.

94.     Mr. Wilson was falsely accused by the Defendants and his government, wrongfully indicted, and unlawfully seized, searched, and detained.

95.     Mr. Wilson is entitled to discover how this happened and to receive compensation from the people responsible for his public humiliation, the seizure and search of his person and property, and the sullying of his good name.

**FOR A FIRST CAUSE OF ACTION**
**False Arrest in violation of the**
**Fourth Amendment brought under 42 U.S.C. § 1983**
**(Against Ofcs. Brown and Thompson)**

96.     Each of the foregoing paragraphs are incorporated here as if stated verbatim.

97.     At all relevant times, Defendants were acting under the color of state law.

98.     Defendants deliberately or with reckless disregard of the truth made materially false statements or omissions that duped the grand jury into believing there was probable cause to conclude Plaintiff committed crimes.

99.     These materially false statements or omissions undercut any probable cause determination by the grand jury.

100.    Defendants were responsible for these materially false statements and omissions.

101.    The grand jury relied on the materially false information Defendants provided and returned an eight-count indictment against Plaintiff on that basis.

102.    A federal magistrate judge relied on the indictment and issued an arrest warrant requiring Plaintiff to be taken into custody, which he was.

103.    As a direct and proximate result of Defendants' conduct, Plaintiff was indicted, arrested, searched, detained, and humiliated and is entitled to recover damages, present and prospective, including for lost wages, mental anguish, distress, shock, loss of reputation, the violation of his Fourth Amendment rights, and other expenses.

104.    Accordingly, Plaintiff is entitled to a judgment against Defendants, jointly and severally, awarding Plaintiff actual and punitive damages to compensate Plaintiff and punish Defendants to impress upon them the wrongfulness of their actions.

**FOR A SECOND CAUSE OF ACTION**
**Wrongful Indictment/Malicious Prosecution in violation of the**
**Fifth and Fourteenth Amendment brought under 42 U.S.C. § 1983**

105.    Each of the foregoing paragraphs are incorporated here as if stated verbatim.

106.    At all relevant times, Defendants were acting under the color of state law.

107.    Defendants initiated a criminal proceeding against Plaintiff without probable cause—i.e., without a reasonable belief that Plaintiff, in fact, committed federal drug trafficking and gun crimes.

108.    The proceeding ended in Plaintiff's favor. [2]

109.    As a direct and proximate result of Defendants' conduct, Plaintiff was indicted, arrested, searched, detained, and humiliated and is entitled to recover damages, present and prospective, including for lost wages, mental anguish, distress, shock, loss of reputation, the violation of his Fifth Amendment rights, and other expenses.

---

[2] A malicious prosecution plaintiff need only show his prosecution ended without a conviction; he is not required to offer affirmative evidence of his innocence. Thompson v. Clark, 596 U.S. 36 (2022). Nevertheless, Plaintiff can show both.

110.    Accordingly, Plaintiff is entitled to actual and punitive damages against the Defendants, jointly and severally, to compensate Plaintiff and punish Defendants to impress upon them the wrongfulness of their actions.

### JURY DEMAND

111.    Plaintiff respectfully demands a trial by jury on all claims so triable.

### PRAYER

**WHEREFORE**, Plaintiff respectfully prays for judgment against the Defendants for all actual, consequential, and punitive damages allowed by law, and for all other relief the Court deems just and proper.

Respectfully submitted,

s/Christopher P. Kenney
Christopher P. Kenney (Fed ID No. 11314)
CHRIS KENNEY LAW
808 Lady Street, Suite D7 (29201)
Post Office Box 1377
Columbia, SC 29202
(803) 546-3695
cpk@chriskenney.law

ATTORNEY FOR PLAINTIFF
BRYAN MONTIEA WILSON

April 8, 2024
Columbia, South Carolina.